FILED

May 13, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time: 11:01AM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT NASHVILLE

| | | |
|---|---|---|
| **BUSTER BARRETT,** | ) | |
| **Employee,** | ) | **Docket No.  2015-06-0186** |
| | ) | **State File No. 78378-2014** |
| **v.** | ) | |
| | ) | |
| **LITHKO CONTRACTING, INC.,** | ) | **Docket No.  2015-06-0188** |
| **Employer,** | ) | **State File No.  24788-2015** |
| | ) | |
| | ) | |
| **and** | ) | **Docket No.  2015-06-0189** |
| | ) | **State File No.  24789-2015** |
| **ACE AMERICAN INSURANCE** | ) | |
| **and THE TRAVELERS,** | ) | **Judge Joshua Davis Baker** |
| **Carriers.** | ) | |

## EXPEDITED HEARING ORDER FOR MEDICAL BENEFITS

This matter came before the Court on the Request for Expedited Hearing filed by the employee, Buster Barrett, pursuant to Tennessee Code Annotated section 50-6-239 (2015).  The Request encompasses three separate claims for injuries on August 27, 2014, January 15, 2015, and January 21, 2015, and Mr. Barrett's request for medical and temporary benefits for these dates of injury.  Though all of the alleged injuries occurred in the course and scope of employment for Lithko, it changed workers' compensation coverage during the applicable period.  Accordingly, two different insurance carriers are potentially responsible for the claims: Ace American and Travelers.

The central legal issues are whether Mr. Barrett has shown by the requisite standard of proof that he is likely to succeed at a hearing on the merits in proving entitlement to benefits and, if so, which carrier is responsible.  For the reasons set forth below, the Court finds Ms. Barrett is entitled to additional medical treatment for his August 27, 2014 workplace accident but failed to carry his burden of proving entitlement to temporary disability benefits. The Court further finds Ace American is the carrier

responsible for payment of the medical benefits.

## History of Claim

Buster Barrett is a forty-eight-year-old resident of Robertson County, Tennessee. Mr. Barrett worked as a concrete finisher for Lithko, a job he had performed for approximately twenty-three years. His principal job involved supervising the pouring of concrete floors at commercial building sites. Mr. Barrett testified he either worked directly for, or had been associated with, Lithko since 1987. Over the years, he worked as a concrete laborer, finisher, and finisher lead with supervisory responsibilities. He sustained a prior work-related injury in 2009 for which he had three neck surgeries.

On August 27, 2014, the first date of alleged injury, Mr. Barrett and his coworkers were pouring concrete on a jobsite. As the concrete poured through a hose, a pressure bump caused the concrete to spray the operator in the eyes. The operator released the hose and Mr. Barrett spontaneously grabbed it in order to keep it from hitting him or or other employees or damaging machinery. The force of the hose twisted Mr. Barrett. He described the injury as twisting his left arm and shoulder, "messing my back up, my left hip and my left shoulder." He reported the injury to Lithko supervisors on the date of the incident.

Mr. Barrett did not receive treatment that day, but rested in one of Lithko's work trucks. He testified that although still experiencing pain in his shoulder, hip, back and legs, he returned to work the next day but did little work, alternating between standing and sitting the entire day. Regarding medical care, Mr. Barrett stated that Lithko did not offer to take him to the doctor but suggested he utilize "call-a-doctor" services. He declined to use these services because a coworker had a negative experience with the service.

At the time of the incident, Mr. Barrett was laboring under restrictions from a prior work-related injury. These restrictions prohibited Mr. Barrett from lifting more than twenty-five pounds and from pushing or pulling more than twenty pounds. The restrictions also prohibited overhead work and work involving vibration. (Ex. C.)

Mr. Barrett stated he continued to work until January 15, 2015, but suffered constant pain. During that time, his responsibilities were limited and included, "mak[ing] sure tools was [sic] on the job" and "tell[ing] the guys each morning what to do, stand outside the pour, and make sure that they was [sic] doing their job[.]"

Mr. Barrett testified that on January 15, 2015, his supervisor, Brad, insisted he work in a concrete slab because they were short-staffed. He accidentally stepped into a hole and pulled his left leg so severely it damaged his boot. He felt significant increased

2

back pain that began after the August 2014 incident. He reported the incident to Brad, who was a supervisor under Will Phelps. Mr. Barrett did not ask for medical care, and Lithko did not report the injury.

A few days later, on January 21, 2015, Mr. Barrett testified he suffered another accident, the third injury at issue, on a job site when he stepped in a deep tire rut. Mr. Barrett stated he did not tell anyone about the incident other than another concrete finisher. He answered "No" when asked if believed the incident caused him further injury.

Mr. Barrett stated by February 4, 2015, the accumulation of pain made it difficult to walk, and he insisted to his Lithko supervisors that he needed to see a doctor. A Lithko employee took him to Dr. Nevels at U.S. Healthworks. Gallagher Bassett coordinated this treatment, and Ace American paid for the visit. Dr. Nevels took x-rays, gave him a back brace, and assigned work restrictions. The restrictions prohibited Mr. Barrett from lifting from the floor to the waist and from lifting more than five pounds from his waist to his shoulder. They also prohibited him from bending, stooping, kneeling, squatting, climbing stairs, climbing ladders, reaching or performing overhead work. (Ex. C.) He also referred him for orthopedic evaluation and physical therapy.

Mr. Barrett stated he gave a copy of his restrictions to Will Phelps and Chris Dittman. According to Mr. Barret, Mr. Dittman commented that Dr. Nevels "might as well have told you to do nothing then." He stayed at the office that day and assisted with scheduling. The next day, on February 5, he did standing supervision, made sure adequate tools were on the job, and oversaw other employees' work.

When he returned to Lithko the following Monday, on February 9, 2015, Mr. Barrett testified he was given a separation letter and essentially told he was fired. The company gave him $5,000 as severance compensation. When Mr. Barrett asked the reason for the termination, Lithko said it was because a recently laid concrete floor was not flat. Mr. Barrett acknowledged unpreventable conditions, such as weather, can sometimes spoil new concrete surfaces but claimed Lithko never criticized him or the quality of his work until after his August 27, 2014 accident. Mr. Barrett asserted he received no formal reprimands or indication his job was in jeopardy because of work issues until his termination on February 9, 2015. Mr. Barrett insisted any concrete problems were not his fault and claimed he was not the supervisor for the workers who were reprimanded for safety violations.

Mr. Barrett believes Lithko terminated his employment because of his new work restrictions of February 4, 2015, and the termination had nothing to do with the quality of his work. However, he admitted that neither Dr. Standard nor Dr. Nevels took him off from work, and further admitted he would still be working for Lithko but for his

termination.

Gallagher Bassett denied Mr. Barrett's claim shortly after his February 4, 2015, examination by Dr. Nevels. Mr. Barrett has received no temporary disability payments since his employment termination. He has received no authorized medical treatment since February 4, 2015. However, he continued to treat on his own with Dr. Scott Standard, a surgeon who treated a 2009 work related neck injury.

William Phelps is Lithko's operations manager for the Nashville area. He became Mr. Barrett's supervisor in 2014. Mr. Phelps stated he was aware Mr. Barrett had a neck injury in 2009, had undergone three neck surgeries, and had been on light-duty restrictions since 2012. Mr. Phelps agreed Lithko accommodated Mr. Barrett's 2012 work restrictions and placed him in a lead supervisory position.

Mr. Phelps was on the job site on August 27, 2014, and confirmed the basic facts of the incident with the concrete hose Mr. Barrett testified the hose weighed at least twenty-five pounds even without extra pressure. Mr. Phelps stated thirteen other workers were on the job site, yet Mr. Barrett took it upon himself to grab the hose in violation of his light-duty work restrictions when he sustained the alleged injuries.

Mr. Phelps stated he reported the incident to Philip Maciula the next morning. They collectively agreed to monitor the situation and provide care if Mr. Barrett expressed a need for medical attention. Mr. Phelps agreed Lithko provided no medical treatment on the date of the injury, but maintained that Mr. Barrett did not ask for treatment. Mr. Phelps testified he asked Mr. Barrett directly the following morning whether he needed to do anything; Mr. Barrett replied, "No, I think I'm okay."

Mr. Phelps stated he filled out the First Report of Injury on September 18, 2014, because Mr. Barrett continued to complain of pain in his arm, left shoulder, head, and neck. (Ex. F.) Mr. Phelps forwarded the First Report of Injury to Mr. Maciula because he was responsible for scheduling medical appointments.

Mr. Phelps recalled when Mr. Barrett stepped into an isolation hole on January 15, 2015. According to Mr. Phelps, Mr. Barrett did not report suffering any injury. Mr. Phelps suggested Mr. Barrett notify Mr. Maciula about the incident but did not know if Mr. Barrett did so. Mr. Phelps stated he only recently became aware of the January 21, 2015 incident. He admitted he did not file an accident report for either incident.

Mr. Phelps insisted Lithko terminated Mr. Barrett due to performance inadequacy and safety violations, not because of his injuries. Mr. Phelps cited several examples of poor work he attributed to Mr. Barrett. (Exs. H, I.) He testified the quality issues cost Lithko additional time and money. (Ex. J.) In addition to these quality issues, Mr.

4

Phelps also cited several incidents where the concrete floors poured under Mr. Barrett's supervision did not meet "flatness" specifications.[1] (Ex. N.) Mr. Phelps agreed, however, that Lithko did not formally reprimand Mr. Barrett for any of these performance problems. He also agreed that the cost overruns that involved Mr. Barrett were similar to those of other employees.

In November 2014, Mr. Phelps recalled Mr. Barrett requested a raise. When Mr. Barrett asked for the raise, Mr. Phelps investigated whether Mr. Barrett had conducted required daily planning meetings and weekly "toolbox talks," an industry term for safety meetings. Mr. Phelps concluded Mr. Barrett did not regularly conduct these meetings and counseled Mr. Barrett on their importance. For a period of time, Mr. Barrett conducted the meetings. According to Mr. Phelps, however, Mr. Barrett's compliance was short-lived, and he eventually realized he could not depend upon Mr. Barrett to conduct these required meetings. He eventually took the responsibility of performing daily planning meetings and weekly toolbox talks away from Mr. Barrett.

Mr. Phelps also recounted several incidences of workplace safety infractions while Mr. Barrett was lead supervisor. On January 5, 2015, a client photographed a Lithko employee working outside the safety zone without a securing harness. Mr. Phelps insisted Mr. Barrett was a responsible lead supervisor at the site and asked him into the meeting where they terminated that employee. Mr. Phelps also cited Mr. Barrett's failure to conduct a safety meeting on January 20, 2015, as a serious safety infraction. Mr. Barrett did not conduct a safety meeting that day but only dropped off safety harnesses and drove to another job site. Mr. Phelps acknowledged Lithko commonly had multiple employees on multiple jobs so it was possible Lithko had assigned Mr. Barrett to deliver harnesses to another job site the same morning.

Mr. Phelps agreed Mr. Barrett had been a good employee but, maintained Lithko terminated his employment because of ongoing safety and quality control problems. Mr. Phelps stated Mr. Barrett's shortcomings resulted in Lithko exceeding project budgets and suffering overages in labor costs. (Ex. J.) Although Mr. Phelps agreed the cost overruns were not solely due to projects of which Mr. Barrett was responsible, Lithko remained concerned with what it regarded as Mr. Barrett's lax attitude toward safety issues, performance, and job quality issues.

Philip Maciula is operations manager at Lithko. Mr. Maciula stated he was in charge of territory safety in the Nashville and Kansas City offices and his job responsibilities were to reduce accidents and facilitate communication with employees

---

[1] Flatness describes the general leveling of the floor when measured against industry specifications. The flatness testing reports submitted by Lithko concerned several floors poured in several states including Alabama. Mr. Phelps admitted that Mr. Barrett might not have been on a jobsite in Alabama on January 15, 2015, where the flatness of the floor failed to meet quality standards.

and doctors.  Mr. Maciula testified Lithko conducts safety training at the time of hire, reviews OSHA and company requirements, and stresses the importance of planning and safety meetings.

Mr. Maciula stated Mr. Phelps advised him Mr. Barrett injured his shoulder on August 27, 2014.  Mr. Maciula agreed no one completed a first report of injury until September 2014, but explained the delay was due to a general understanding because Mr. Barrett was doing well and the incident "was not a big deal."  Mr. Maciula insisted he checked with Mr. Barrett about the condition of his left shoulder on August 27, 2014, and again on September 18, 2014.  At that time, Mr. Barrett indicated his shoulder continued to hurt and Mr. Maciula filled out a First Report of Injury.  Mr. Maciula made an appointment for Mr. Barrett at U.S. Healthworks, but Mr. Maciula was uncertain he told Mr. Barrett about the appointment.  Mr. Maciula stated he followed up with Mr. Barrett in October and Mr. Barrett reported he was doing well.

Mr. Maciula stated he next spoke with Mr. Barrett on January 15, 2015, when he reported stepping in an isolation hole.   He did not complete an injury report. Mr. Barrett indicated his back pain related to the August 27, 2014, pressurized hose incident.  Mr. Maciula recalled the conversation ended with Mr. Barrett saying he did not need to go to the U.S. Healthworks clinic.

Mr. Maciula believed the first time Mr. Barrett requested medical treatment was February 4, 2015.  Mr. Maciula discussed the new restrictions with Mr. Phelps and it was agreed Lithko could accommodate the restrictions by utilizing Mr. Barrett as a "point-of-contact" and in supervisory roles.  Mr. Maciula submitted the February medical treatment to Gallagher Bassett under the August 27, 2014 report of injury since Mr. Barrett attributed his injuries to that event.  He confirmed Gallagher Bassett provided Lithko's workers' compensation coverage until August 31, 2014.

Mr. Maciula recalled he contacted Mr. Barrett on January 22, 2015, and that Mr. Barrett did not complain of any medical issues.  Mr. Maciula acknowledged until recently he was unaware Tennessee law requires providing a panel of physicians to injured workers, rather than directing them to a specific medical provider as was Lithko's practice.

Regarding the basis for Mr. Barrett's employment termination, Mr. Maciula recounted an incident in June 2014, when one of Lithko's employees removed his safety cables while working at elevated heights.  Mr. Macuila admitted Mr. Barrett was not involved in this incident but testified he was involved in another heights violation on the same job location on January 5, 2015, that again involved a worker working outside the safety area without proper equipment.  In Mr. Macuila's opinion, although the violation occurred, Mr. Barrett did his job appropriately that day as the records showed he advised

6

the employee on fall protection safety prior to the violation.

Mr. Macuila, however, believed Mr. Barrett did not perform his job appropriately when another heights violation occurred on January 20, 2015. In that incident, two employees were photographed working outside the safety area without harnesses. Lithko determined Mr. Barrett had the responsibility to conduct a safety meeting that day but failed to do so. Mr. Maciula deemed the violation serious and stated it "puts coworkers at risk of death." Mr. Maciula further stated, however, he believed that before January 2015 there were no safety issues involving Mr. Barrett.

Concerning the workplace restrictions placed on Mr. Barrett by Dr. Nevels, Mr. Macuila testified he discussed the restrictions with Mr. Phelps. Mr. Macuila understood that Mr. Phelps accommodated his restrictions by providing supervisory work prior to his termination.

Chris Dittman is the manager for Lithko's Nashville division, and is responsible for scheduling workers. Mr. Dittman stated his contact with Mr. Maciula, who worked mainly out of the Kansas City office, was by telephone. Mr. Dittman also stated he was aware Mr. Barrett had no criticism of his safety and work quality until after the August 2014 work injury.

When asked why Lithko terminated Mr. Barrett, Mr. Dittman stated: "It was our inability to appropriately plan—plan the work and do it in a safe manner and do it with quality, and our inability to do a DPP on a daily basis that would address all of the issues that we were having on an ongoing manner." Mr. Dittman characterized Mr. Barrett's safety record as "bad" based upon the January 5 and January 20, 2015 incidents. However, Mr. Dittman was unaware Lithko assigned Mr. Barrett to deliver harnesses at one job site and to be at another site at the same time on the same morning.

Concerning accommodation of the restrictions imposed by Dr. Nevels, Mr. Dittman testified that Lithko accommodated Mr. Barrett's restrictions and put him back to work up until his termination.

Mr. Barrett explained when Lithko denied his claim, he returned to Dr. Standard for medical treatment since the doctor was familiar with his earlier 2009 neck injury. Dr. Standard confirmed in his deposition it is his medical opinion the injuries are related to the August 27, 2014 incident. Mr. Barrett is still treating with Dr. Standard and is awaiting the results of his back MRI. He also saw Dr. Beauchamp for his shoulder pain from the August 27, 2014 injury, and the doctor has given him injections, cortisone-steroid shots, and ordered an MRI.

Mr. Barrett believed all his injuries arose from the August 27, 2014, incident when he grabbed the errant concrete hose. He insisted he had no back pain until the August incident. Since then his legs go numb and he cannot walk. He falls, he must drag himself at times, and he gets burning sensations in his leg with sharp pain down his legs into his feet. He never had those problems until August 2014 and he has not worked since Lithko fired him on February 9, 2015.

Mr. Barrett received treatment for his back and shoulder from Dr. Standard under private health insurance. An MRI ordered by Dr. Standard showed severe stenosis at several levels of the lumbar spine. (Ex. C.) Dr. Standard attributed Mr. Barrett's back and shoulder problems to the August 27, 2014 date of injury. He stated the following at his deposition:

> Notwithstanding these other injuries occurred in January of 2015, I think that the primary causative injury for the exacerbation and advancement of his lumbar condition occurred on the concrete injury of August 27th, 2014. He had underlying degenerative disc disease and spinal stenosis that was made symptomatic at that time that progressed over the time period requiring treatment.

(Ex. B. at 26.)

Mr. Barrett filed three Petitions for Benefit Determination (PBD) on April 1, 2015, one for each date of alleged injury, seeking temporary disability payments and medical benefits. (T.R. 1, 2, 3.) The parties did not resolve the disputed issues through mediation and the Mediating Specialist filed Dispute Certification Notices (DCN) for each PBD. (T.R. 4, 5, 6.) Mr. Barrett filed Requests for Expedited Hearing for each DCN pursuant to Tennessee Code Annotated section 50-6-239 (2014). (T.R. 7, 8, 9.)

At the Expedited Hearing, the parties stipulated Mr. Barrett was an employee on each of the alleged dates of injury. The parties also stipulated Ace American Insurance, with Gallagher Bassett as third-party administrator, provided Lithko's workers compensation insurance up to August 31, 2014. Beginning on September 1, 2014, Travelers assumed coverage. The parties further stipulated Mr. Barrett would be entitled to the maximum weekly rate for any temporary disability benefits. Additionally, the parties stipulated Mr. Barrett timely reported the August 27, 2014 accident.

**Findings of Fact and Conclusions of Law**

Mr. Barrett seeks medical treatment for his back and shoulder injuries as well as temporary disability benefits. Mr. Barret has the burden of proving all essential elements of his case in order to receive these benefits. *See* Tenn. Code. Ann. § 50-6-239(c)(6)

8

(2015); *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). He does not, however, need to prove every element of his claim by a preponderance of the evidence in order to obtain relief at an expedited hearing. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Instead, he has the burden to come forward with sufficient evidence from which this Court can determine that he is likely to prevail at a hearing on the merits. *Id.* As explained herein, the Court finds Mr. Barrett carried his burden of proving entitlement to medical benefits but failed to carry his burden of proving entitlement to temporary disability benefits.

The parties generally do not dispute that Mr. Barrett suffered an injury on August 27, 2014, when a coworker lost control of a concrete hose. In addition to this incident, however, Mr. Barrett also alleged he suffered injury in two other work-related incidents; one on January 15, 2015, the other on January 21, 2015. Because Lithko changed workers' compensation insurance carriers between the first and second incidents, the primary issue is which carrier is responsible for compensating Mr. Barrett for his injuries. The Court finds Ace American is the responsible carrier.

**I.      The August 27, 2014 incident resulted in Mr. Barrett's need for medical treatment.**

Under the Workers' Compensation Law, "injury" means "an injury by accident . . . that causes death, disablement or the need for medical treatment[.]" Tenn. Code Ann. § 50-6-102(14) (2015). To be compensable, an injury must be "caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment." *Id.* "An injury arises primarily out of and in the course and scope of employment only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes[.]" *Id.* (internal quotations omitted). Except in the most obvious cases, medical causation of an injury must be established through expert medical evidence. *See Thomas v. Aetna Life & Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991).

Here, the evidence showed Mr. Barrett suffered a significant injury to his back on August 27, 2014, while trying to contain a loose concrete hose. He stated when he grabbed the hose it twisted his arm and shoulder to left, "messing my back up, my left hip and my left shoulder." Mr. Barrett did not request treatment that day but spent the remainder of the day lying down in a work truck.

In contrast to the August 27, 2014 accident, the other two incidents were considerably less severe. On January 15, 2015, Mr. Barrett stepped in an isolation hole and experienced additional back pain. Although Mr. Barrett reported the incident, he

continued to work the remainder of the day. He also continued to work after the January 21, 2015 incident when he experienced pain after stepping into a tire rut. Mr. Barrett did not report this incident. Furthermore, Mr. Barrett indicated in his testimony that any pain he experienced from these incidents related to the August 27, 2014 incident.

In addition to the facts that demonstrate the greater severity of the August 27, 2014 incident, the medical testimony also supports a finding that this incident caused Mr. Barrett's back and shoulder condition and his current need for medical treatment. Dr. Standard had treated Mr. Barrett for approximately five years prior to the August 27, 2014 incident. He performed two cervical surgeries on Mr. Barrett and, therefore, had considerable knowledge of his physical condition. *See Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991) (finding that treating physicians have "the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one.").

In his deposition, Dr. Standard opined that the August 27, 2014 incident caused Mr. Barrett's back injury. Although he agreed he could not rule out that the January incidents caused some advancement or anatomical change during cross-examination by Ace American's counsel, on redirect examination he stated the following:

> Notwithstanding these other injuries occurred in January of 2015, I think that the primary causative injury for the exacerbation and advancement of his lumbar condition occurred on the concrete injury of August 27th, 2014. He had underlying degenerative disc disease and spinal stenosis that was made symptomatic at that time that progressed over the time period requiring treatment.

(Ex. B at 26.) The Court finds this testimony sufficient to establish medical causation.

Having found Mr. Barrett's need for treatment resulted from the August 27, 2014 accident, the Court will now address Ace American's claim that Mr. Barrett should be denied recovery because he acted outside of his workplace restrictions when he grabbed the concrete hose. Tennessee Code Annotated section 50-6-110(a)(2014) denies compensation to employees whose injury resulted from the employee's willful misconduct, self-inflicted injury, failure or refusal to use a safety device, willful failure to perform a duty required by law or voluntary participation in a recreational activity. The Court finds that Mr. Barret's spontaneous reaction of grabbing a loose concrete hose that presented a danger to him, other employees and Lithko's equipment fails to qualify as an activity that may reasonably be classified as misconduct under the statute. Accordingly, the Court finds Ace American's defense meritless.

In summary, the Court finds Mr. Barrett carried his burden of proving he would likely succeed at a hearing on the merits in proving he suffered a work-related injury on

August 27, 2014, and that this incident resulted in the injury which required medical treatment. Because Ace American provided workers' compensation insurance coverage for Lithko on this date, the Court finds Ace American liable for any benefits due Mr. Barrett for his injury.

**II.     The Court declares Dr. Standard the authorized treating physician.**

Mr. Barrett also asks the Court to authorize his medical treatment for his back with Dr. Standard and for his shoulder with Dr. Beauchamp because Lithko failed to provide him with a panel of physicians following the August 27, 2014 injury. The Court finds the request for designation of Dr. Standard as the authorized treating physician well-taken.

Tennessee law requires an employer to provide "free of charge to the employee such medical and surgical treatment . . . made reasonably necessary by accident as defined in this chapter[.]" *See* Tenn. Code Ann. § 50-6-204(a)(l)(A) (2014). In providing the treatment, the Workers' Compensation Law requires an employer to, "designate a group of three (3) or more independent reputable physicians, surgeons, chiropractors or specialty practice groups if available in the injured employee's community or, if not so available, in accordance with subdivision (a)(3)(B), from which the injured employee shall select one (1) to be the treating physician." *Id.* at 50-6-204(a)(3)(A)(i).

Panels provided under section 50-6-204(a)(3)(A)(i) must be provided to the injured employee in a timely fashion. In fact, the Bureau of Workers' Compensation rules require the employer to "immediately" provide the injured employee a panel. Tenn. Comp. R. & Regs. 0800-02-01-.25(1) (2015). If an employer fails to provide a panel, it risks having to pay for all reasonable and necessary medical expenses incurred by an employee for treatment with an unauthorized physician. *See McCreary v. Yasuda Fire & Marine Ins. Co. of Amer.*, No. 01S01-9507-CH-00106, 1996 Tenn. LEXIS 102, at *5-6 (Tenn. Workers' Comp. Panel Feb. 20, 1996) (citing Tenn. Code Ann. § 50-6-204)). The Court finds Lithko failed to satisfy its obligations under the statute that forced Mr. Barrett to seek unauthorized treatment with Dr. Standard.

Following the August 27, 2014 injury, Mr. Barrett initially declined Lithko's offers of medical care. However, when Mr. Barrett finally requested care, Lithko provided treatment through Dr. Nevels at U.S. Healthworks in a timely manner. In addition to providing care, Dr. Nevels also recommended Mr. Barrett receive orthopedic care from a specialist. Lithko never provided Mr. Barrett a panel. When he did not receive a panel, Mr. Barrett sought treatment from Dr. Standard. As stated previously, Dr. Standard and Mr. Barrett had a longstanding doctor-patient relationship, with Dr. Standard having previously treated Mr. Barrett for several work-related injuries. The Court finds Mr. Barrett's decision to seek treatment from Dr. Standard reasonable under the

circumstances. Furthermore, because of Mr. Barrett's relationship with Dr. Standard, and because of Lithko's failure to provide a panel of orthopedic specialists, the Court appoints Dr. Standard to serve as the authorized treating physician. Ace American shall pay for reasonable and necessary care recommended by Dr. Standard.

Mr. Barrett also seeks the authorization of care provided by Dr. Beauchamp. At this time, however, the Court has insufficient information to demonstrate either the reasonableness or necessity of Dr. Beauchamp's treatment. Instead, the Court finds it appropriate to appoint Dr. Standard as the authorized treating physician and allow him to coordinate any necessary medical care. This decision does not prevent Mr. Barrett from submitting further proof of the reasonableness or necessity of Dr. Beauchamp's care in a subsequent proceeding.

### III. Mr. Barrett failed to prove entitlement to temporary disability benefits.

Mr. Barrett requests payment of temporary disability benefits. In order to establish a prima facie case for temporary total disability benefits, the worker must show (1) he is totally disabled and unable to work due to a compensable injury, (2) the work injury and inability to work are causally connected, and (3) the duration of the disability. *Jewell v. Cobble Construction and Arcus Restoration,* No. 2014-05-0003, 2015 TN Wrk. Comp. App. Bd. LEXIS 1, at *21 (Tenn. Workers' Comp. App. Bd. Jan. 12, 2015). An employee is entitled to receive temporary partial disability benefits, pursuant to Tennessee Code Annotated section 50-6-207(2) (2014), when "the temporary disability is not total." *Stem v. Thompson Servs.,* No. M2010-01566-WC-R3-WC, 2011 Tenn. LEXIS 742, at *27 (Tenn. Workers' Comp. Panel July 26, 2011). An employee may recover temporary total disability benefits until he is able to return to work or attains maximum medical improvement. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015).

Because Dr. Nevels released Mr. Barrett to return to work with restrictions, his recovery is limited to temporary partial disability benefits. However, Lithko maintains Mr. Barrett cannot recover any temporary partial disability benefits because it terminated him for cause. The Court agrees.

An injured employee is not entitled to temporary disability benefits if terminated for cause *and* the employer was reasonably capable of providing modified duty within the restrictions assigned. To be excused from this obligation, the employer must demonstrate that an employee's termination resulted from a breach of the reasonable expectations of the employer and appears reasonably appropriate. In such cases, the employer is deemed to have made reasonable efforts to accommodate the employee's work restrictions and the work injury is not the reason for his

12

termination.  *See generally Jones v*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48; *Carter v. First Source Furniture Group,* 92 S.W.3d 367, 371-372 (Tenn. 2002) (holding that, "an employer should be permitted to enforce workplace rules without being penalized in a workers' compensation case"); *Ingram v. Heads Up Cutting Ctr.*, No. M2012-00464-WC-R3-WC, 2013 Tenn. LEXIS 338, at *20 (Tenn. Workers' Comp. Panel Apr. 10, 2013); *see also Durham v. Cracker Barrel Old Country Store, Inc.*, No. E2008-00708-WC-R3-WC, 2009 LEXIS 3, at *9 (Tenn. Workers' Comp. Panel Oct. 22, 2008).[2]

Here, Mr. Dittman testified that Lithko could have accommodated the restrictions imposed on Mr. Barrett by Dr. Nevels and, in fact, did so up until his termination. Furthermore, despite the statement Mr. Dittman made concerning the restrictions— essentially that Dr. Nevels might as well have said that Mr. Barrett could not do anything—Mr. Barrett agreed he would still be working for Lithko but for his termination.  The Court finds this evidence sufficient to prove Lithko could have accommodated Mr. Barrett's work-related restrictions.

The Court further finds Lithko terminated Mr. Barrett for cause.  While the timing of his termination raised some question as to motive, the testimony from Mr. Dittman and Mr. Phelps demonstrated Lithko had a valid reason for his firing.  Mr. Phelps testified Lithko was concerned with what it regarded as Mr. Barrett's lax attitude toward safety issues, performance, and job quality issues.  Mr. Dittman corroborated this testimony when he stated: "It was our inability to appropriately plan—plan the work and do it in a safe manner and do it with quality, and our inability to do a DPP on a daily basis that would address all of the issues that we were having on an ongoing manner." Though not completely supportive, the totality of the evidence tended to support this testimony by showing Mr. Barrett failed to conduct regular safety and planning meetings and was in a supervisory role when two serious safety violations occurred.  Additionally, Lithko pointed to concerns about work quality and cost overruns.  While all were not directly attributable to Mr. Barrett's work, at least some of the quality and cost issues were. Accordingly, the Court finds Mr. Barrett failed to prove he would likely succeed at a hearing on the merits in proving entitlement to temporary disability benefits and denies his request.

**IT IS, THEREFORE, ORDERED** as follows:

---

[2] The Tennessee Workers' Compensation Appeals Board allows reliance on precedent from the Tennessee Supreme Court "unless it is evident that the Supreme Court's decision or rationale relied on a remedial interpretation of pre-July 1, 2014 statutes, that it relied on specific statutory language no longer contained in the Workers' Compensation Law, and/or that it relied on an analysis that has since been addressed by the general assembly through statutory amendments." McCord v. Advantage Human Resourcing, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, *13 n.4 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).

13

1. Dr. Scott Standard shall serve as the authorized treating physician.

2. Lithko shall provide medical treatment for Mr. Barrett's work-related injury with Dr. Scott Standard.  Dr. Standard or Mr. Barrett shall provide bills for these services to Lithko.  Ace American or the third party administrator, Gallagher Bassett, shall be responsible for payment.

3. Mr. Barrett's request for temporary disability benefits is denied at this time.

4. This matter is set for an Initial (Scheduling) Hearing on June 10, 2016, at 9:30 a.m. (CDT).  The parties are instructed to contact the Court Clerk if they wish to reschedule

5. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2015).  The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order.  Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

6. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471.

**ENTERED ON THIS THE** 13th **DAY OF MAY, 2016.**

_____

**Judge Joshua Davis Baker**
**Court of Workers' Compensation Claims**

Initial Hearing:

An Initial (Scheduling) Hearing has been sent for **June 10, 2016, at 9:30 a.m. Central Time** with **Judge Joshua Davis Baker, Court of Workers' Compensation Claims. You must call 615-741-2113 or toll free at 855-874-0474 to participate in the Initial Hearing.**

**Please Note:** **You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk within seven business days of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a filing fee in the amount of $75.00. Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

**APPENDIX**

Exhibits:

    A. Affidavit of Buster Barrett
    B. Deposition of Scott Standard
    C. Medical Records
    D. Picture from Job Site
    E. Root Cause Analysis with Date of Incident of 6/16/14
    F. First Report of Injury
    G. Root Cause Analysis with Date of Incident of 8/27/2014
    H. Saw Cut Photographs (2)
    I. Concrete Finishing Photographs (7)
    J. Breakdown of Place Finish Labor Costs
    K. Root Cause Analysis with Date of Incident of 1/05/2015
    L. Root Cause Analysis with Date of Incident of 1/20/2015
    M. Certificate to Return to Work or School 8/17/2012
    N. Floor Flatness Testing Reports, 1/20/15 & 2/02/15
    O. Medical Records of Dr. Standard
    P. Notes Prepared by Philip Macuila

Technical Record:

1. Petition for Benefit Determination (PBD) – Docket No. 2015-06-0186
2. PBD – Docket No. 2015-06-0188
3. PBD – Docket No. 2015-06-0189
4. Dispute Certification Notice (DCN) – Docket No. 2015-06-0186
5. DCN – Docket No. 2015-06-0188
6. DCN – Docket No. 2015-06-0189
7. Request for Expedited Hearing (REH) – Docket No. 2015-06-0186
8. REH – Docket No. 2015-06-0188
9. REH – Docket No. 2015-06-0189
10. Agreed Order Rescheduled Expedited Hearing
11. Amended PBD Adding Second Injury Fund as a Party
12. Travelers' Notice of Appearance
13. Travelers' Pre-trial Brief
14. Travelers' Witness and Exhibit List
15. Ace American's Notice of Appearance
16. Ace American's Pretrial Brief
17. Notice of Filing Medical Records
18. Notice of Filing Supplemental Exhibit
19. Buster Barret's Pretrial Brief

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order For Medical Benefits was sent to the following recipients by the following methods of service on this the 13th day of May, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|------|------|------|------|
| Jill Draughon, Counsel for Employee | | | ✓ | jdraughon@hughesandcoleman.com |
| John Barringer, Counsel for ACE American Insurance/Gallagher Bassett | | | ✓ | jbarringer@manierherod.com |
| Wm. Ritchie Pigue, Counsel for Travelers | | | ✓ | rpigue@tpmblaw.com |
| Patrick Ruth Counsel for SIF | | | ✓ | patrick.ruth@tn.gov |

_____

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**

18